FILED
U. S. DISTRICT COURT
DISTRICT OF NEBRASKA

2023 APR 17 PM 2: 15

RECEIVED

APR 17 2023

CLERK
U.S. DISTRICT COURT
LINCOLN

# United States District Court

for the

## Eighth District of Nebraska

Kevin Rogers - plaintiff )
)
-vs- )
)
Steven E. Wolf, John B. Holcomb, )
David G. Baer, Fiona M. Wood, )
Avita Medical Limited, )
Jorg C. Gerlach, RenovaCare Sciences, )
the University of Pittsburgh, )
AgTac Services LLC, )
Level Up Home Pros Inc )

Case No. 4:23-CV-3058-JFB

Jury Trial:  Yes __   No ✕

# COMPLAINT FOR A CIVIL CASE

## I.   The Parties to This Complaint

Plaintiff Kevin Rogers.  Individual defendants Steven E. Wolf,

John B. Holcomb, David G. Baer, Fiona M. Wood, and Jorg C. Gerlach.

Corporate defendants the University of Pittsburgh, Avita Medical Limited,

RenovaCare Sciences, AgTac Services LLC, and Level Up Home Pros Inc.

## II.   Basis for Jurisdiction

✓ Federal question    ✓ Diversity of citizenship

## A.    Federal questions at issue

18 U.S. Code § 241.  (Federal statute covering civil conspiracy.)

28 U.S. Code § 4101.  (Federal statute covering defamation.)

## B.    The Amount in Controversy

2,228,800,000 US dollars.

# III.    Statement of Claim

Plaintiff has a hereditary skin disease that variously goes by the names dishydrotic eczema, pompholyx eczema, and hand eczema (though some people get it on their feet).  This complaint shall hereafter refer to it as pompholyx.  After accidentally discovering that his skin (hands) could heal with *no scars whatsoever* from a burn injury, plaintiff campaigned to interest researchers in studying the phenomenon.  The campaign began in 2003 and involved, mostly, postal letters and emails sent to various persons, institutions, philanthropies, and biotech companies.

Most doctors consider pompholyx a mysterious "idiopathic" condition, there is little-to-no agreement on its causes.  In his letters/emails, plaintiff proposed the idea that pompholyx sufferers lack sweat pores which then causes sweat (i.e., salinity) to accumulate within their skin which, in turn, causes pompholyx symptoms.  Plaintiff also proposed the idea that pompholyx's symptoms are nothing more than the body attempting to heal non-existent burns.  Plaintiff believes his ideas on pompholyx and burn healing were, and remain, legally protected intellectual property (hereafter, IP) and that, beginning in early 2006, various defendants conspired to steal said IP and use it to create spray on skin for burns (hereafter, SOS).

Plaintiff also believes various defendants have coordinated an elaborate coverup of their theft of plaintiff's IP and that, both the initial theft and the subsequent cover-up, constitute a civil conspiracy which has tortiously injured plaintiff. The civil conspiracy violates 18 U.S. Code § 241.

Plaintiff also believes various defendants are continuously, knowingly, and maliciously committing defamation-by-omission against him and have been doing so since May of 2008. The maliciousness of the defaming stems from defendants' need to coverup their theft of plaintiff's IP, or, at the very least (should the court rule that plaintiff's IP was not stolen), their desire to dishonestly take all the credit and all the glory for the burn care breakthrough that is SOS. Said tortious defaming is covered by 28 U.S. Code § 4101.

**Exhibits 1a through 1c.** Medications prescribed for plaintiff's pompholyx, and a photo of plaintiff's hand showing pompholyx.

**Exhibit 2a.** The postal letter (part of a packet of material) plaintiff sent, in late 2005, to a number of individuals at the National Institutes of Health. Plaintiff contacted numerous NIH employees because he hoped to get at least one responding letter or email; he wanted documents (correspondence) he could save, in the event he might someday need to prove a thing or two. Experience had taught plaintiff that only about 1-in-20 persons contacted would ever respond. (NIH employees' response rate was above the usual.) The court will note that the so-called "meta-data" on exhibit 2a show that it was last modified on February 12, 2008. And the file "type" is "Microsoft Word 97 – 2003."

**Exhibit 2b.** A PDF copy of exhibit 2a. Included only for convenience at trial, if parties to this dispute prefer referencing a PDF rather than a Microsoft Word file.

**Exhibits 3a through 3f.** Photos that were added, in early 2006, to plaintiff's standard packet of materials that he was sending to scientists and others from 2003-2007.

**Plaintiffs' letters to NIH employees**

**were passed around within the NIH**

**Exhibit 4a.** A December 9, 2005 email plaintiff received from Doreen M. Quimby, an employee at the National Institutes of Health/National Institute of Arthritis and Musculoskeletal Diseases, or NIH/NIAMS. Plaintiff did not write to Ms. Quimby. Rather, plaintiff contacted NIH/NIAMS employee Maria Morasso who forwarded plaintiff's mailing to Ms. Quimby and asked her to respond.

**Exhibit 4b (in two pages).** A letter plaintiff received, in December of 2005, from an NIH employee who responded on behalf of NIH employee Janet S. Austin. Exhibit 4b shows that plaintiff's correspondence meant for one NIH employee was passed around to multiple NIH employees. Plaintiff wrote to a Cheryl Kitt, who did not respond, but rather asked an NIH employee named Janet S. Austin to respond. Ms. Austin then set a third NIH employee, Mary Fleming, to the task of responding. In the second paragraph of the first page of exhibit 4b, one sees a reference to plaintiff's "thoughts about the possible associations among eczema, genetics, burn wounds, and sweat glands in the skin."

In the next-to-last paragraph of exhibit 4b one sees a reference to "fish venom."  This is because in some letters/packets plaintiff was mailing out, plaintiff proposed that human skin's reaction to venomous fish stings could be the same reaction Nature uses to deal with burn wounds.

**Exhibits 5a through 5g.**  Various responses plaintiff received from various persons between July of 2004 and December of 2006.  They give evidence of the extreme, years-long effort plaintiff made to make a burn care breakthrough possible; the extreme difficulties plaintiff faced.

**Exhibit 5g (in two pages).**  The then-dean of USC's medical school, Dr. Brian Henderson, did not bother to read plaintiff's letter before responding to it.  Plaintiff believes Dr. Henderson responded only because USC's then-President, Steven Sample, asked him to.  Plaintiff had earlier visited President Sample's office, in person, where he explained himself and gave his usual letter-regarding-burn-healing-and-pompholyx to Mr. Sample's receptionist.

**Exhibit 5e.**  Another example of the difficulty of plaintiff's campaign to make a burn care breakthrough possible.  The respondent returned plaintiff's letter and wrote on it: "I have hundreds of wonderful ideas and hypotheses, but the world does not usually provide money to anyone with 'just an idea,' and most researchers will not be distracted from their own fields of interest and hypotheses."

Although plaintiff's cover letter varied over the years, with a DVD of digital photos (exhibits 3a through 3f) being added to the overall packet of material circa February of 2007, all cover letters conveyed the same basic ideas.  Those ideas are as follows: That (a) pompholyx's strange variety of symptoms represent Nature's efforts to heal varying severities of non-existent

burns; that (b) the most extreme of pompholyx symptoms, in which the skin takes on a sponge-like appearance, represents Nature's efforts to heal a deep burn; that (c) salinity created by the body's sweat glands may get trapped within the skin after a partial thickness burn, owing to the burn damaging the pores that allow sweat to escape to the skin's outer surface; and that (d) when trapped sweat accumulates within the skin, mother Nature sees this as a toxic situation – or as a burn – and launches processes for creating new skin in order to remedy the situation.

Plaintiff's explaining the above-listed original ideas can be seen at the following locations within exhibit 2a or 2b: page two, paragraph two; page three, paragraphs four and five and seven; and much of pages four and five.

**Exhibit 6 (in 17 parts).**  Defendant Jorg Gerlach's professional biography, as taken in March of 2018 from Pitt's McGowan Institute's webpages.  For the first 22 years of his career Dr. Gerlach studied liver disease.  Of particular interest within exhibit 6 is scientific paper number 96, published in 2006.  It documents the first instance of Dr. Gerlach taking an interest in either skin or burn healing.

**Exhibit 7.**  The abstract for the scientific paper that is listed, within exhibit 6, as scientific paper number 96.  It describes an investigation of whether or not heavy drug-, alcohol-, steroid-, or tobacco use, or diabetes, effects how well a patient's skin can recover from injury.  The court should note the German surnames among the paper's authors; and that Dr. Gerlach is from Germany.

**Exhibit 8.**  In 2003, Dr. Gerlach worked at the Charité, Medical Faculty of the Berlin Universities, Berlin, Germany, prior to his being hired by Pitt.  Hence: Exhibits 7 and 8 indicate he contacted old friends in Germany and asked if they would attach his name to one of their skin research papers.

**As further regards exhibit 6.**  Scientific paper number 96 represents Dr. Gerlach's dipping his toe into the waters of skin research.  He needed to give himself at least a bit of a skin research track record before announcing to the world that he had made an astounding, historic breakthrough in burn treatment.  In paper number 99 (from January of 2007), one sees a second instance of Dr. Gerlach taking an interest in skin; this time, focusing on burns.  In published papers number 103 and 106 (both from 2008), the court can see a third and a fourth instance of Dr. Gerlach studying skin and/or burns.

**Within exhibit 6**, there are a total of 15 scientific papers that Dr. Gerlach has published on skin regeneration and/or burns.  The numbers of the skin and/or burn research papers, as they are listed in exhibit 6, are as follows: 96, 99, 103, 106, 128, 134, 141, 146, 148, 154, 155, 161, 163, 164, 165.  Plaintiff believes it is unclear whether paper number 161 is, in fact, related to skin/burns.  But he is listing it here, nonetheless.  All of the 15 papers on skin/burns were published after November of 2005, when plaintiff mailed packets of material to various persons at the NIH/NIAMS.

**Exhibit 9.**  A fraudulent burn research paper (number 99, as listed within exhibit 6) that was received by the journal, Annals of Plastic Surgery, in September of 2006.  Plaintiff believes the paper was originally a legitimate paper and *was rewritten to make it appear to be about SOS*.  At the bottom right of the PDF's first page, it is claimed that 19 patients were treated with SOS.

Plaintiff suspects that perhaps only two or three people had been treated with SOS prior to September 2006 – and those persons were, quite likely, treated at the University of Pittsburgh, not in Germany.

**Exhibit 10.** In February of 2007, various defendants attempted to pull a dirty trick on the unsuspecting readers of a mass circulation newspaper. (Relevant to this pleading as it informs the court regarding certain defendants' character.) In exhibit 9, one sees that defendant Gerlach had already had success with SOS in early-to-mid-2006 and, plaintiff submits, said success – reducing patients' burn scars – would have been startling and downright historic. Yet despite this, and despite Dr. Gerlach's working at Pitt's McGowan Institute where Dr. Stephen Badylak (mentioned numerous times in exhibit 10, but not a party to this dispute) worked, Dr. Gerlach is never mentioned in exhibit 10.

Plaintiff submits that Dr. Gerlach's non-appearance in exhibit 10 is due to various defendants' desire to keep secret their early-2006 theft of plaintiff's IP – at least until the statute of limitations clock on a possible civil suit had run out. The Wall Street Journal was a mass circulation newspaper and if Dr. Gerlach's SOS breakthrough were featured and plaintiff happened upon the Journal's reportage, plaintiff would have known who had stolen his IP.

In a nutshell: Defendants wanted to keep secret their theft of plaintiff's IP while simultaneously running an experiment to see if they could take advantage of another ordinary American, another non-scientist who might step forward with a credible story of unusual-healing-due-to-a-gene-mutation-or-an-unusual-medical-condition. That, plaintiff submits, is what exhibit 10 shows them doing.

**Exhibits 11a and 11b.**  On April 17, 2008, the US Department of Defense announced the formation of the then-new Armed Forces Institute of Regenerative Medicine, or AFIRM.  Of particular interest is this paragraph from exhibit 11a:

> "The AFIRM will be made up of two multi-institutional consortia, one led by Wake Forest University, Winston-Salem, N.C., and the University of Pittsburgh; and one led by Rutgers University, New Brunswick, N.J., and the Cleveland Clinic.  The U.S. Army Institute of Surgical Research in San Antonio, Texas, will work with these academic consortia to provide key guidance on military medical needs and conduct trials of new therapies."

Per exhibits 11a and 11b, the public was falsely led to believe the Army was optimistic about future research relating to "burn repair" and "wound healing without scarring."  In reality, in 2006, defendant Gerlach had already made a huge breakthrough in reducing burn scars which was made possible by the theft of plaintiff's IP.


**Exhibit 12.**  Defendant Gerlach appeared in the May 19, 2008 issue of Newsweek magazine.  Plaintiff happened upon Newsweek's story while at his dentist's office and the happenstance is how plaintiff learned of Dr. Gerlach and his use of SOS.

Per exhibits 9, 11a, 11b, and 12, Dr. Gerlach seems to have been an AFIRM-affiliated scientist as of the date of AFIRM's launching on April 19, 2008.  Doctors at the US Army Institute of Surgical Research, or USAISR, at Fort Sam Houston, San Antonio, were tasked with conducting clinical trials of new treatments/technologies developed by AFIRM-affiliated scientists.

Defendant John Holcomb was the commanding officer in charge of the USAISR when AFIRM was launched.  During the same time period, defendant David Baer was in charge of the USAISR's Bone and Soft Tissue Program.

**Exhibits 13a and 13b.**  Defendant John Holcomb probably retired from his post as commander in charge of USAISR in early-to-mid 2008.  (Per exhibit 10, he was definitely USAISR's commanding officer in late-2006/early-2007 when, per exhibit 9, defendant Gerlach was having great success with SOS.)

**Exhibit 13c (combined with exhibit 10).**  Defendant David G. Baer has worked at the USAISR from early 2007 until at least 2022.

**Exhibits 14a and 14b.**  Dr. Gerlach travelled to Lincoln, Nebraska and lectured at Nebraska Wesleyan University on his success with SOS on January 26, 2012.  Plaintiff did not attend the lecture but was very upset to learn of it.  Around the same time, plaintiff happened upon an online news story concerning the activist group Anonymous.  The news story said Anonymous' email address was press@anonplus.net and/or it said Anonymous had a YouTube channel and, upon visiting the channel, plaintiff noticed the email address.

Plaintiff emailed Anonymous to ask for help in exposing defendants' theft of his IP as well as their ongoing deception of the public and taxpayers.  Plaintiff explained his situation and invited the group to visit a YouTube channel of his where, months earlier, he had posted more detailed information about his saga.

Plaintiff thought Anonymous might help popularize his (then-)YouTube channel, which was an earlier and differently-named version of plaintiff's more recent, and/or current YouTube

channel.  Plaintiff also thought the group could pester journalists to report on his saga, or help conduct what once was known as "industrial espionage," possibly linking plaintiff up with an insider—a spy—working at Fort Sam Houston or at Pitt.

Anonymous never responded except, perhaps, for a lone email that arrived around February or March of 2012, from someone using a female name who did not identify herself as a member of Anonymous.  She simply said she liked plaintiff's YouTube channel and wished him luck.

Plaintiff responded with a few social pleasantries along with a paragraph or so of grumbling about the obstacles an investigative reporter would face; how a trusted mole would likely be needed to leak documents.  Plaintiff also responded briefly to the (presumed) woman's concerns about plaintiff's emotional well-being.  (Plaintiff believes the FBI likely has a copy of this email exchange.  So if the court wants a transcript, the court should ask them.)

On April 17th, 2012, at three o'clock in the morning, while on lunch break at work, plaintiff stumbled upon news of a string of mysterious bomb threats targeting Pitt.  Plaintiff quickly concluded they might be a consequence of his having contacted Anonymous in February.  After getting home from work, plaintiff scrambled to prepare emails for Pittsburgh area news outlets; the first went to the Pittsburgh Post-Gazette at about 12:40 a.m., on Wednesday, the 18th.

**Exhibit 15.**  The emails included much explaining; plus apologies to Pitt students, staff, and faculty; plus PDF file attachments of supporting documents.  The supporting documents were: a 2005 letter from the NIH/NIAMS (i.e., exhibit 4b); a 2008 Newsweek magazine story profiling defendant Gerlach (i.e., exhibit 12); a 2008 DoD press release announcing the new Armed Forces Institute of Regenerative Medicine, or AFIRM (i.e., exhibit 11a); and a PDF of the letter plaintiff had been sending to scientists from 2003-2008 (i.e., exhibit 2b).

Plaintiff believes his emails made it very clear why the bomb threats might have been getting done on his behalf. Yet despite everything, Pittsburgh-area journalists wanted him to explain further. Plaintiff did not know how to respond to such requests. His emails did not mention his contacting Anonymous – only that he had contacted 'activists' or 'an activist group' – and he did not know if could do so without causing the FBI to quickly confiscate his computer and all the documents he had saved over the years, which he would need to prove his IP was stolen.

"Persons of interest" in Pennsylvania, according to news accounts, had had their home computers confiscated and been forced to appear before federal grand juries. April 17th of 2012 was an extremely stressful, frightening, and chaotic day for plaintiff and it was on said day, or the following day, that plaintiff deleted his email to Anonymous and his later (responding) email to the (presumed) woman who told plaintiff she liked his YouTube channel. (Plaintiff wishes to hereby state again his belief that the FBI has copies of a number of his emails, including the two just mentioned.)

Plaintiff's concerns about having his computer confiscated are why he contacted Pittsburgh news outlets rather than law enforcement. Plaintiff hoped his contacting the media would result in news coverage of his allegation of IP theft and/or his allegation that a Pitt scientist had been publicly lying about a major burn care breakthrough. Plaintiff thought such news coverage would make it difficult for the government to keep his computer, or would otherwise put pressure on Pitt and Pitt employees to explain a thing or two. But no news outlets were interested in plaintiff's revelations/allegations and, hence, plaintiff submits that journalists contacted by plaintiff kowtowed to government- and/or Pitt requests to quash what should have been an extremely newsworthy story.

**Exhibits 16a through 16f.**  Pittsburgh area news outlets gave extensive coverage to the spring, 2012 bomb threats targeting Pitt, with much of the coverage focused on their mysteriousness; the seeming lack of a motive behind them and the (reported) lack of demands from the person(s) sending them.  Plaintiff thus believes the revelations he emailed to the news media should have merited similar coverage.  Plaintiff did not know – and still does not know – who made the threats, and yet, plaintiff did give the media a credible explanation of a possible motive for the threats.

As further regards media coverage of the bomb threats: Plaintiff believes there was no national news coverage of them prior to April 17, 2012.  Being a bit of a news hound, plaintiff visits news websites daily.  Such was plaintiff's habit in 2012, for many years prior to 2012, and today.  Plaintiff wishes to state such to pre-empt defendants' suggesting during trial that plaintiff knew of the threats prior to April 17, 2012 and failed to expeditiously provide his knowledge about them—or the possible motive for them—to law enforcement.  Plaintiff believes law enforcement authorities asked journalists not to give the threats national coverage so as to avoid encouraging a person(s) who, they believed, was seeking attention.

Because reports at the time said some threats were being sent through the Pittsburgh Post-Gazette, plaintiff believes his emails to said media outlet essentially went straight to the FBI.  In the case of one email and follow-up phone call to Pitt's student paper, the Pitt News, plaintiff believes he was communicating directly with an FBI agent posing as a student reporter.  After sending an email to pittnews@pittnews.com, plaintiff called to confirm its having been received and was told the paper was using a new email account named news@pittnews.com.  Plaintiff then sent his information and PDFs to said new account and made another follow-up call.  (See

PLEADING PAGE **13** OF **48**

the 4:17 mark within exhibit 15.)  A woman who answered the phone confirmed receiving everything and quickly began asking questions.  Plaintiff told the presumed journalist that his email provided a complete explanation of the bomb threats—or at least a possible motive for them—and he would answer questions only after the journalist read it.  Plaintiff then immediately hung up, not wanting to attempt the absurdity of trying to explain verbally, over the phone, how he made a burn care breakthrough possible and how his IP was stolen.

   As of late 2022, no journalist from any Pittsburgh- or Pennsylvania news outlet has ever contacted plaintiff or expressed interest in learning more about plaintiff's story/allegations. Plaintiff believes this evidences the Pennsylvania media's having been co-opted and put into service protecting Pitt's prestige and its annual inflow of approximately 700,000,000 federal dollars for research grants and innumerable other items and expenses.  Plaintiff asks that the court consider this if defendants file to move this dispute to Pennsylvania.

   **As further regards exhibit 15.**  Plaintiff believes that, in net effect, via his emails to FBI-agents-posing-as-journalists, he reported an IP theft, committed by one or more Pitt employees, to the FBI's Pittsburgh office.  Plaintiff believes there was no investigation of the then-reported/then-alleged IP theft because, like the news media, Pittsburgh-based FBI agents had also been co-opted by Pitt and put into service protecting its reputation and its massive inflows of federal dollars.


**Pitt as a Semi-Private School**

**&**

**Its Extreme Funding Woes**


PLEADING PAGE **14** OF **48**

Pennsylvania law allows what are called "state-related," or semi-private schools. Pitt was a failing private school in 1966 when it was rescued by Pennsylvania and became state-related. In exchange for state support, state-related schools are required to give Pennsylvania residents discounted tuition. What is *not* required, however, is thorough disclosure about budgeting and staffing. In Pitt's case the result seems to be a perpetual lack of trust, among legislators, that Pitt is run efficiently. This then causes a perpetual refusal to provide reasonable state funding while, simultaneously, Pittsburghers perpetually insist that the school remain open. It's all pretty dysfunctional and, in the long term, a perfect formula for over-reliance on federal dollars and— ultimately—institutionalized grifting.

**Exhibit 17a.** State-related schools "remain separate and private entities, operating under their own charters, governed by independent boards of trustees, and with its assets under their own ownership and control, thereby retaining much of the freedom and individuality of private institutions, both administratively and academically." They are also "exempt from Pennsylvania's Open Records law except for a few minor provisions."

**Exhibit 17b.** Funding for Pitt requires a two-thirds vote of Pennsylvania's House and Senate; the funding itself has a "non-preferred appropriation status"; and the funding bills are "passed separately from the General Fund."

**Exhibit 17c** The reportage says: "The state's appropriation, which in the 1970s covered 35 percent of Pitt's operation, now covers 7 percent … and for the first four months of this year [Pitt] faced the possibility of no state appropriation at all."

**Exhibit 17d.** A Pitt document which states that Pitt supports "more than 27,000 local jobs." And that "Pitt employs more than 13,000 people on its five campuses." And that "One in 230

PLEADING PAGE **15** OF **48**

jobs within Pennsylvania is attributable to Pitt." And that "Pitt is the nation's top-ranked public university in Saviors of Our Cities: 2009 Survey of Best College & University Civic Partnerships." And that "Military Advanced Education magazine has named Pitt one of the country's top military-friendly universities in 2014."

**Exhibit 17e.** Pitt has 12,386 local employees; while the University of Pittsburgh Medical Center, or UPMC, has 43,000 employees, making it Pittsburgh's number one employer.

**Exhibit 17f.** A document from the Pennsylvania Department of Labor and Industry. It lists UPMC Presbyterian Shadyside as Allegheny County's top employer in Q4, 2017. Pitt is listed at number two. The federal government is listed at number three.

Plaintiff believes the relationship between Pitt and the UPMC is very complex, very murky, and beyond the scope of this pleading. Plaintiff nonetheless submits that Pitt may well be America's first national university due to it getting most of its funding from federal taxpayers and, thus, as a matter of law, legislators of the 49 states, ex-Pennsylvania, might have a rightful claim to knowing more about Pitt's budgeting, staffing, salaries, and expenditures.


**Exhibit 18a.** Pitt has over 180 Centers and Institutes, many of which seem redundant. Plaintiff submits that the institutes are used to fluff-up Pitt; to make Pitt seem too-big-to-fail, too-essential-to-Pittsburgh's-economy-to-not-be-supported.

**Exhibit 18b.** Pitt may have created a redundant new institute for the sole purpose of rewarding a onetime NIH employee, Mark T. Gladwin, who may have given plaintiff's IP to Pitt scientists. In 2008 Mr. Gladwin was made founding director of Pitt's then-new Heart, Lung, Blood and Vascular Medicine Institute (since renamed as the Vascular Medicine Institute).

**Exhibit 18c**. In the fall of 2009, Pitt may have created a redundant new institute for the sole purpose of rewarding a onetime NIH employee, Rocky S. Tuan, who may have given plaintiff's IP to Pitt scientists. Mr. Tuan was made founding director of Pitt's then-new Center for Cellular and Molecular Engineering.

**Exhibit 18d.** Pitt's McGowan Institute of Regenerative Medicine's biography for Mr. Tuan. In the first paragraph of exhibit 18d's second page, the following is said about Mr. Tuan:

> "In the fall of 2009, Dr. Tuan was recruited by the University of Pittsburgh School of Medicine to be the Founding Director of the Center for Cellular and Molecular Engineering, and as the Arthur J. Rooney, Sr. Chair Professor and Executive Vice Chairman of the Department of Orthopaedic Surgery, with a joint appointment as Professor in the Department of Bioengineering."

**Additionally, per exhibit 18d.** Mr. Tuan was made a Co-Director of the Armed Forces Institute of Regenerative Medicine, or AFIRM; and the founding director of Pitt's Center for Military Medical Research, or CMMR; and an associate director of Pitt's McGowan Institute.


**Exhibits 19a through 19j.** In January and April of 2014 Plaintiff contacted Pitt's top leaders and proposed a settlement. Because plaintiff's grievance required much explanation, a DVD with a video or videos was included in each mailing. In exhibits 19a and 19b, the court can see plaintiff's mailings weighed .30 lbs., which is too heavy for a mere cover letter, but about right for a cover letter and a DVD inside a hard-plastic case. *Each mailings' explanation of plaintiff's grievance would have made very clear to all recipients: Pitt scientists had stolen private property to create SOS and were lying to the public about SOS's origins.*

PLEADING PAGE **17** OF **48**

Exhibits 19a and 19b document the January mailings to two Pitt administrators; exhibits 19c through 19i document the April mailings to seven Pitt administrators and/or board members. The April mailings went to: Mark Nordenberg, Pitt's then-Chancellor; John Harvith, Pitt's then-Associate Vice Chancellor for National Media Relations; Kathy Wilson Humphrey, Pitt's then-Vice Provost and Dean of Students; Eva Tansky Blum, a then-member of Pitt's board of trustees and chair of the committee charged with selecting a new Chancellor, and also then-Executive Vice President and Director of Community Affairs for PNC Bank in Pittsburgh; Patricia Beeson, Pitt's then-Senior vice Chancellor and Provost; Tom Corbett, a then-Pitt board member (non-voting) and then-governor of Pennsylvania; and, finally, Morgan O'Brien, a then-Vice Chair of Pitt's board, and then-President and CEO of Peoples Natural Gas in Pittsburgh.

The court will note that exhibits 19d, 19e, 19f, 19h, and 19i show that plaintiff's packages weighed .40 lbs.  Exhibits 19c and 19g show that plaintiff's packages weighed 2.0 lbs.  Plaintiff believes the heavier packages resulted from his including a printout of his packet-meant-for-scientists.

Exhibit 19j is the responding letter plaintiff received from Pitt's then-Associate Vice Chancellor for Technology Management and Commercialization.  It is the sum total of Pitt's response to plaintiff's January- and April, 2014 proposal for a settlement.

**Exhibits 20a and 20b.**  In 2016, Pitt launched a new Institute for Cyber Law, Policy, and Security (later renamed the Cyber Institute), and hired a David J. Hickton to be its founding director.  Mr. Hickton was US Attorney for the Western District of Pennsylvania during the 2012 bomb threats against Pitt.  Because plaintiff had informed Pitt's leaders, in 2014, about Pitt employees' theft of plaintiff's IP and their public lies regarding SOS's origins – Pitt's leaders

likely knew, upon hiring Mr. Hickton, that he and/or Pittsburgh-based FBI agents had done Pitt a favor by neglecting to investigate the theft of plaintiff's IP. At the very least, Mr. Hickton and/or the FBI had kept quiet about what plaintiff told them, in 2012 (when FBI agents posed as news reporters), regarding a logical motive for the bomb threats and said threats possible connection to some very dishonest, and possibly criminal, conduct on the part of Pitt scientists. In other words, Mr. Hickton and/or the FBI in Pittsburgh had helped cover-up Pitt employees' public lies about SOS's origins as well as their early-2006 theft of a Nebraska resident's valuable IP.

**Exhibit 20c.** In 2016, Pitt Chancellor Patrick Gallagher was part of a "Commission on Enhancing National Cybersecurity" and may, as of late 2022, be a "member of the Cybersecurity Advisory Committee for the Cybersecurity and Infrastructure Security Agency," a US government agency, online at cisa.gov. Plaintiff submits that Pitt is deeply involved with America's national security agencies; deeply involved with the DoD and the US Army; ethically compromised as an educational institution; and fiscally beholden unto various national security- and/or national defense agencies, including the Army. Pitt announced Mr. Gallagher's selection as the school's new Chancellor in February of 2014; he was hired directly from the U.S. Department of Commerce where he was Acting Deputy Secretary and Director of the National Institute of Standards and Technology.

**Exhibit 21a.** In August of 2017, Pitt hired a scientist directly from the DoD's Defense Advanced Research Project Agency, or DARPA, to be the founding dean of its then-new School of Computing and Information, or SCI. (Plaintiff submits that it is preposterous to believe Pitt did not already have the equivalent of a "School of Computing and Information.") And an especially curious tidbit—from the fifth line of the fifth paragraph of exhibit 21a: A software

initiative Pitt's new dean oversaw while at DARPA was one that focused on "extracting knowledge from text."  Plaintiff submits that such software could be used to steal IP online.

**Exhibit 21b.**  Around May of 2018, Pitt launched a new institute named the Modeling and Managing Complicated Systems Institute, or MoMaCS Institute.  Per the highlighted area on page two of exhibit 21b, Pitt employees at the MoMaCS Institute would fiddle around with artificial intelligence software that "can read 200,000 journal articles" – which, plaintiff submits, sounds like the perfect software for stealing IP.

**Exhibit 21c.**  The mission statement, as seen in late 2018, of Pitt's CyREN lab.  The court will note the unintelligible, doublespeak-laden quality of the statement.  Plaintiff submits that the doublespeak can be interpreted to mean that either Pitt employees are not doing much of anything at the CyREN lab, or they do not want outsiders to know what they are doing.


**Exhibit 22a.**  The website homepage of the National Cyber-Forensics and Training Alliance, or NCFTA.  The court will note NCFTA's credo: "Companies, Government, and Academia working together to neutralize cyber crime."

**Exhibit 22b.**  Pitt's Cyber Institute, the NCFTA, and the Pittsburgh office of the FBI are in close geographic proximity.

**Exhibit 22c.**  Another example of Pitt being intertwined with federal security and/or defense agencies; exhibit 22c is a screen grab of a webpage for Pitt's Laboratory for Education and Research on Security Assured Information Systems, or LERSAIS.  The text says: "[Pitt] has been designated as a National Center of Academic Excellence in Information Assurance Education since 2004 jointly by the National Security Agency (NSA) and the Department of Homeland Security (DHS)."

**In summation, regarding exhibits 20a through 22c**, plaintiff submits that there are a heck of a lot of people around Pitt and Pittsburgh who have a heck of a lot of experience with cyber-crime, cyber-security, and documenting-reading AI software developed by DARPA.  There is a heck of a lot of collaboration and/or personal networking happening among employees at Pitt, DARPA, the US Army, the NSA, and the US Attorney's office in Pittsburgh.  There also appears to be a lot of fiscal interdependence, as scientific breakthroughs achieved by Pitt employees reflect well on US Army-, DARPA-, and NSA employees—and breakthroughs enhance everyone's chances of getting more federal dollars, or otherwise seeming productive when meeting with members of the US Congress.

Plaintiff believes the court should consider the possibility that Pitt employees may be laying the groundwork for their systematic theft intellectual property; that said theft may, or could, use DARPA-developed AI software to scan documents online; that Pitt's connections to federal security agencies such as the NSA could lead to Pitt employees participating in eavesdropping on communications among scientists and inventors whose schools and/or corporate employers do not have connections to the US government's various security bureaucracies.  Additionally, plaintiff submits that Pittsburgh-based FBI agents and/or the US Attorney for Western Pennsylvania may, in the future, ignore reports of IP theft committed by Pitt employees – especially if victims reside outside Pennsylvania.

### Pre-emptively Addressing Possible Motions to Move

Plaintiff believes exhibits 15 through 22c provide relevant information about Pitt's institutional character and also, in net effect, preemptively address a *possible* motion to move

this dispute to Pennsylvania.  Plaintiff would like Pitt's attorneys to know he has *additional*

*documents* indicating that Pitt is radically underfunded by the commonwealth of Pennsylvania,

radically aggressive in bringing federal dollars into Pittsburgh, and used by Pennsylvanians as a

federally-funded job-creation apparatus.  Said documents will be introduced in response to a

motion to move this dispute to Pennsylvania.

As regards a *possible* motion to move this dispute to Texas:

**Exhibit 22d.**  According to the University of Texas Health, San Antonio, Military Health

Institute, "Annual funding from the military to UT Health San Antonio averages over $15

million per year."  Exhibit 22d also shows two electronic links labeled "Grants Process" and

"Grant Tips & Tricks."  (Per exhibit 13b, defendant John Holcomb began working at UT Health

in September of 2008, and may still work there.)

**Exhibit 22e.**  Under "Our Partnerships," exhibit 22e speaks of UT Health San Antonio's

"many military partnerships" and "200 collaborative inventions," some of which were "created

with military co-inventors."  Plaintiff submits that exhibit 22e hints at some fairly murky

relationships between UT Health San Antonio researchers and the DoD.  It hints at the possibility

of UT Health employees getting help from DoD employees when applying for patents; help in

gaming America's patenting system.

**Exhibit 22f.**  Join Base San Antonio (a.k.a., Fort Sam Houston) employs more than 36,000

active-duty military personnel and DoD civilians.

**Exhibit 22g.**  In 2017, the city of San Antonio registered the trademark "Military City

USA."  The city manager is quoted as having said, "Annually, the military community

PLEADING PAGE **22** OF **48**

contributes close to $50 billion to our local economy ... [and] nearly 10% of those who live in San Antonio are associated with Joint Base San Antonio in some direct or indirect way."

## On US Law, Patents, and Intellectual Property Ownership

Plaintiff believes defendants may attempt to employ a kind of chicanery, or argumentation, at trial; a chicanery that will play upon popular misconceptions about patents, patent law, and IP ownership.  Plaintiff thus pre-emptively wants all defendants to know that he knows the following: As a matter of law, a person need not be a patent holder to be the owner of IP.  One does not even need to have applied for a patent.  One only needs to prove that one thought of an idea first – which is often a very difficult thing to do.  By way of contrast, in plaintiff's case, his unique personal experience with a burn injury, in combination with his having a unique medical condition and his presenting a few telltale letters/emails, have made it very easy to prove who 'thought-of-it-first.'

As further regards IP law: Patents do not convert public property into private property. Patents and patenting systems are simply a means by which sovereign nations can help inventors capitalize on their ideas or inventions.  Under US law, infringing on a patent is a civil infraction. Stealing IP is a criminal infraction.

Plaintiff hopes the court will cut short any time-wasting defense nonsense involving or spotlighting plaintiff's not being a patent holder or scientist; or not being a professor at a large university; or not having a PhD; or not having a track record of invention or entrepreneurship.

## The Involvement of Defendant Level Up Home Pros

PLEADING PAGE **23** OF **48**

1

2      **Exhibit 23a (in two parts).**  In November of 2020, defendant Level Up Home Pros, Inc

3

4    purchased the residential apartment building in which plaintiff, at that time and until at least

5    January of 2023, rented a unit.  Although exhibit 23a says a business named Chronicles

6    Properties purchased the property, exhibit 23b shows that an entity named Level Up Home Pros

7    Inc was the actual buyer.

8      **Exhibit 23b.**  In November of 2020, defendant Level Up Home Pros, Inc purchased the

9
     building in which plaintiff, at that time and until at least January of 2023, rented a unit.  (The
10
     previous owners were Greg Sanford and Jody Sanford.)  Exhibit 23b gives 2430 R Street, in
11

12   Lincoln, Nebraska as Level Up Home Pros' mailing address.  Plaintiff's previous landlord

13   owned two rental homes at that location and, it seems, Level Up Home Pros purchased those two

14
     homes in addition to the six-plex at 538 N 24th Street, the building in which plaintiff rented a unit
15
     until at least January of 2023.
16
       **As regards exhibits 23c through 23f.**  Various entities and persons, using various phone
17

18   numbers and email addresses, have presented themselves as managers of plaintiff's residence

19   since it was purchased by Level Up Home Pros Inc.  Plaintiff believes the variety of phone

20   numbers, managers, and management entities is a consequence of efforts to hide the identity of

21
     the property's actual owners.
22
       **Exhibit 23c.**  In early-January of 2021, a person named Kari Saban claimed to be a "leasing
23

24   associate" for a Chronicles Properties, giving a phone number with a Wisconsin area code (262-

25   666-1117), and the email address Lincolnshowings@chroniclesproperties.com.

26

27

28                                    PLEADING PAGE **24** OF **48**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 23d.**  In December of 2021, a Chronicles Properties representative named Brenton Roby emailed plaintiff, giving the phone number 402-671-0400, and the email brenton@725mgmt.com.

**Exhibit 23e.**  In late-January of 2022, an entity named 725 Management LLC sent plaintiff an email.

**Exhibit 23f (in two parts).**  In February of 2022, a person named Ben Giebler sent a postal letter to plaintiff.  Mr. Giebler said the new property management company would be My Landlord Properties LLC and he would be the new property manager.  He gave the email address MyLandlord@TeamLHP.com and the phone number 402-939-6363.

**Exhibit 23g.**  A person named Michael Kramer seems to be the owner, or part owner, of Level Up Home Pros Inc.  (Mr. Kramer may or may not be a party to this dispute.)

**As regards exhibit 23e.**  The email contained a link to a downloadable software app named Resident Center.  Plaintiff suspects the Resident Center software may have included spyware that would have enabled surreptitious access to plaintiff's cellphone and/or desktop PC.

**As regards part two of exhibit 23f.**  Plaintiff was invited to get a "TenantCloud" account using his "bank routing and account number."

**Defendants Surveille Plaintiff**

**&**

**Keep the Statute of Limitations Clock Running**

Plaintiff does not believe the statute of limitations applies to his allegation of an *ongoing* defamation-by-omission. As regards his allegation of a conspiracy to steal his IP and perpetrate a coverup of said theft, and the statute of limitations, plaintiff offers the following exhibits.

**Exhibit 24a.** In July of 2019, a woman named Ruth Gilbert moved into the apartment next to Plaintiff's. Ms. Gilbert moved away in late-September of 2021. Exhibit 24a shows a parcel that was left on plaintiff's doorstep on December 19, 2019. Though it is addressed to plaintiff's next-door neighbor, Ms. Gilbert, the sender did not put her apartment number on it. Plaintiff lives in a six-plex and his apartment is closest to the street. Packages lacking an apartment number are often dumped on plaintiff's doorstep and that is what happened with exhibit 24a. Ms. Gilbert was not home and plaintiff thus left a note on her door and brought the parcel into his apartment. Ms. Gilbert arrived home sometime late that night and received her parcel the next morning.

Plaintiff does not normally make videos of his neighbors' mail. However, since 2012, plaintiff has come to regret not documenting various suspicious events. Plaintiff therefore documented the parcel meant for his neighbor, but left on his doorstep.

**Exhibits 24a through 24d.** The parcel was shipped from Idemia corporation in Chantilly, Virginia. Idemia is a multi-national security and identity services firm with headquarters in Courbevoie, France. The parcel is addressed to Ruthie Gilbert, AgTac Services LLC, 538 N 24th ST, Lincoln, NE 68503. AgTac Services is a Lincoln, Nebraska company that claims to do investigations for businesses. The parcel was labeled "extremely urgent" and was delivered in two days. Plaintiff believes someone involved in the government's surveillance of plaintiff made a mistake; the parcel was supposed to be delivered to AgTac Services, not Ms. Gilbert.

4:23-cv-03058-JFB-PRSE   Doc # 1   Filed: 04/17/23   Page 27 of 48 - Page ID # 27

**As further regards exhibits 24a through 24d**, plaintiff believes the US government has been surveilling calls to-and-from plaintiff's personal cellphone, doing so in the hope that plaintiff might coincidentally communicate with a person whom the government could link to the 2012 bomb threats against Pitt and/or the activist group Anonymous.

For the record, regarding Anonymous: Plaintiff does not believe the government hopes to someday prosecute him for criminal acts; rather, that the government is convinced plaintiff may hold a figurative golden key to unlocking Anonymous' membership list. But the truth is, plaintiff knows nothing about Anonymous beyond what he learned from a news story about the group, in January of 2012. Plaintiff also does not know if Anonymous took action of any kind subsequent to his contacting them; the bomb threats targeting Pitt in 2012, commencing shortly after plaintiff emailed Anonymous, could have been a mere coincidence.

**Exhibit 24e.** On November 4th, 2020, at 1:26 a.m., plaintiff's next-door neighbor, Ruth Gilbert, asked to borrow plaintiff's cellphone. Plaintiff very rarely uses said phone, very rarely has it turned on. Plaintiff believes Ms. Gilbert was assisting the government's surveillance of plaintiff.

Plaintiff's cellphone was a pre-paid TracFone. Plaintiff very rarely had it turned on because he used a landline speakerphone instead. The reason for plaintiff's keeping two phones is as follows: Plaintiff used the speakerphone to record videos of himself speaking with journalists. (Nebraska is a one-party consent-to-record state.) Plaintiff hopes to someday upload the resulting "news tip" videos to YouTube and use them to shame and embarrass journalists into covering his story, which he firmly believes is quite newsworthy. If journalists ever exit their stupor (only a theoretical possibility, it seems), plaintiff intends to drop his landline service and use only a cellphone.

Plaintiff believes the 2020 presidential election of November 3rd, 2020 and the possible re-election of Donald Trump, was the impetus for the request to borrow plaintiff's cellphone.  In other words, Ms. Gilbert's handlers felt that, if there were ever a time when plaintiff would communicate with a (presumably-left-leaning) friend whom the government might link to the 2012 bomb threats against Pitt, it would be on the night on which Donald Trump could win re-election.  Plaintiff believes Ms. Gilbert's handlers were hoping he would leave his cellphone on after Ms. Gilbert returned it.

**Exhibit 24f.**  A conversation plaintiff had with Ms. Gilbert on the afternoon of November 4th, 2020.  The digital metadata on exhibit 24f indicates it was "modified" on November 14 of 2020.  Plaintiff believes that is the date when he transferred the file from his portable voice recorder to his PC.  Plaintiff is not a software expert, but is simply hereby stating his belief that Microsoft Windows software seems to have put a November 14th, 2020 date on the audio file when it was moved from one device to another.

Exhibit 24e shows the outgoing call made from plaintiff's phone.  The call's duration was four seconds.  Exhibit 24f proves that Ms. Gilbert was the person who made the November 4th, 2020 call from plaintiff's phone.

Backing up a bit in the story: As plaintiff turned on his cellphone and handed it to Ms. Gilbert in the early a.m. of November 4th, 2020, some 90 unread text messages appeared on the phone's screen.  Plaintiff remarked that they were from a guy on Facebook and he didn't care about them; didn't care about the Facebook guy and wanted to block his messages but had never gotten around to it.  Plaintiff told Ms. Gilbert to just close the phone's clamshell and try again—or press some buttons to get past the unwanted text messages.  Ms. Gilbert then disappeared into the night with the phone and returned with it a short time later.  Plaintiff subsequently looked at

PLEADING PAGE **28** OF **48**

the phone's internal record of Ms. Gilbert's call and noticed that the call lasted only four seconds.  It then dawned on plaintiff that the call was made not for the purpose of Ms. Gilbert conversing with anyone, but rather for the purpose of assisting the government's surveillance of plaintiff.

Plaintiff of course understood that Ms. Gilbert's phone-borrowing could reset the statute-of-limitations clock on Plaintiff's hoped-for civil suit.  But to reset said clock, plaintiff would need to prove that Ms. Gilbert was the person who made the four-second-long call.

Exhibit 24f documents plaintiff's walking a few steps to Ms. Gilbert's apartment and asking her if she would take his phone and show him how to block messages from the gadfly Facebook guy.  The weather was gorgeous and Ms. Gilbert's door was wide open as she was airing out her apartment.  At the twenty second mark in the recording, plaintiff makes a token knock on Ms. Gilbert's open door and begins speaking.  The conversation proves that Ms. Gilbert did, indeed, borrow plaintiff's phone.

As further regards Ms. Gilbert's phone-borrowing, plaintiff submits that a dead cellphone can be used immediately if plugged into a charger.  If a phone lacks such a capability, it can nonetheless be used after an hour or so of charging.  Thus, Ms. Gilbert did not need to borrow plaintiff's phone; rather, the government wanted to have Ms. Gilbert borrow plaintiff's phone. In summation, per exhibits 24e and 24f, plaintiff submits that defendants AgTac and Level Up Home Pros—acting on behalf of defendant Pitt—are keeping the statute of limitations clock running via their tortious intrusions into plaintiff's life and privacy.

**Exhibit 24g.**  On June 22nd, 2022, two individuals made a surprise visit to plaintiff's residence with the intention of getting photos of the inside of his apartment.  They opened plaintiff's door without knocking, contrary to the usual procedure for even landlords and

maintenance persons who have previously notified tenants of impending visits.  Plaintiff suspects the two individuals are the son and daughter, or niece and nephew, of the owners of defendant AgTac and/or defendant Level Up Home Pros.  The individuals claimed they were not given an apartment number, only the building's street address.  They claimed they were intending to take photos of an empty unit in the building.

The court will note that they did not offer their names although, just seconds before plaintiff got his camera rolling, one of them did mention the name Mike Kramer.  Also of note: The man did not answer when plaintiff asked him his name.  He also did not answer when plaintiff asked if a person named Mike Kramer had sent the two of them.  And he did not respond when plaintiff asked him to name the business that he worked for.  Also of note: There was no need for the woman to physically distance herself from plaintiff when she (supposedly) called the (supposed) person who had sent her to plaintiff's address without an apartment number; no need to prevent plaintiff from recording her end of a cellphone conversation (supposedly) made to clear up a (supposedly) innocent mistake.  She does not seem at all fearful of plaintiff when she approaches him near the video's end.

## Too Many Texans to Ignore

**Exhibit 25a.**  The Executive Vice President of defendant AgTac is a man named Kelly Wavada (may or may not be a party to this dispute).  Mr. Wavada's profile at AgTac's website says he previously served in the Marine Corps, which is part of the Army, and worked "as a law enforcement officer in Texas for several years."  During the winter of 2020-2021, Mr. Wavada once appeared, very briefly, at plaintiff's apartment to show a contractor where the main water

line entered the building.  (It enters via a small closet inside plaintiff's apartment and the water can be shut off there.)  Mr. Wavada said his name was Jason.  He is a bit over six feet tall and has a Texas accent.

**Exhibit 25b (combined with exhibit 23f).**  Within exhibit 23f is a mentioning of a software application named TenantCloud that would enable electronic withdrawal from a renter's bank account.  The TenantCloud company is located in a strip mall in Austin, Texas.  Its offices may be nothing more than a postal box inside a United Parcel Service location.  Google maps shows the mall from a number of angles; no TenantCloud signage can be seen on the building, but there is a UPS office there.

**Exhibit 25c (combined with exhibit 23e).**  At the bottom Exhibit 23e is a link to a Resident Center software app.  Resident Center software is from a company named Buildium (at buildium.com) which, in turn, is part of a company named RealPage (at realpage.com).  RealPage is headquartered in Richardson, Texas.

**Exhibit 25d (combined with part two of exhibit 23f).**  Chronicles Properties' postal address for rent checks may be nothing more than a postal box inside a UPS location.

**Exhibit 25e.**  The Lancaster County Assessor/Register of Deeds lists Level Up Home Pros' mailing address as 2430 R Street, Lincoln, Nebraska.  At that address are two rental homes that Level Up Homes Pros seems to have bought from prior owners Greg and Jody Sanford.  Plaintiff submits that, were it not for Level Up Home Pros owner Michael Kramer's- and others' desire to obscure Mr. Kramer's ownership of the building at 538 N 24th, it would be logical for him to provide his home- or office address to the Lancaster County Register of Deeds.

**Exhibit 25f.**  Mr. Kramer's profile at LinkedIn.com says he resides in Gretna, Nebraska.

Since Level Up Home Pros purchased the building plaintiff lives in—or previously lived in, until at least December of 2022—numerous vehicles with Texas license plates have appeared in the building's parking lot and a woman whose SUV has Texas plates began renting the unit next to plaintiff's.  Plaintiff believes the appearance of so many Texans and/or Texas-plated vehicles is highly improbable and a consequence of AgTac Executive VP- and Texas native Kelly Wavada being involved in efforts to surveille plaintiff.  Plaintiff submits that the surveillance is being done at the behest of defendant Pitt, or is otherwise meant to benefit Pitt, whose employee, defendant Jorg Gerlach, participated in the theft of plaintiff's IP.

**Exhibits 26a and 26b.**  After plaintiff's one-time next-door neighbor, Ruth Gilbert, moved away in September of 2021, plaintiff's landlord remodeled the unit she had been renting. Exhibits 26a and 26b are from the winter of 2021-2022 and they show the contractor's truck, in the building's parking lot, with Texas license plates.

**Exhibit 26c.**  Circa April or May of 2022, a woman who owns/drives a car with Texas license plates moved into the apartment next to plaintiff's.  She does not seem to be a college student and, after many months, she does not seem inclined to obtain Nebraska plates.

**Exhibit 26d.**  Circa October of 2022, a middle-aged man seems to have begun renting a unit on the east side of the building plaintiff lives in.  His car has Texas license plates.

### Defendant Fiona Wood Enters the Story

This pleading will now back up chronologically to late-2008 when, plaintiff believes, defendant Fiona Wood learned of defendant Jorg Gerlach's success with SOS.  Plaintiff does not

know how Ms. Wood learned of Mr. Gerlach, but it could have been via the May 19, 2008

Newsweek story that is exhibit 12; the same means by which plaintiff first learned of Dr.

Gerlach.

Plaintiff believes Ms. Wood contacted persons at Pitt, and/or the US Army, and/or AFIRM

and threatened to publicly accuse Mr. Gerlach of using a completely ineffective and useless SOS

technology that she had patented in Australia.  The technology was trade-named CellSpray and

upcoming exhibits will document its ineffectiveness.  For now, however, plaintiff must

emphasize his belief that Ms. Wood has a number of notable and relevant character traits.  She

tends toward self-promotion and exaggeration; toward what might best be described as

autobiographical legend-building.  She often presents herself publicly as a workaholic and a

great humanitarian; as a kind of compulsive do-gooder.  Her exaggerations can get pretty wild,

sometimes veering off into outright lies.

Her life as a public hero in Australia began after she cared for Australian tourists who were

burned in the October 12, 2002 terrorist bombing of a Bali, Indonesia nightclub.  Around that

time was when she began falsely telling reporters and the public that she was reducing scars

using SOS.  Though she does seem to have experimented with SOS prior to 2009, there are no

pre-2009 scientific papers of hers that support the assertion that she was having success reducing

scars prior to her linking up, in late-2008/early-2009, with persons at AFIRM/the US Army/the

USAISR.  There are also no pre-2009 contemporaneous news stories that support an assertion of

Ms. Wood having any pre-2009 success reducing scars.

Plaintiff believes Ms. Wood leveraged her status as a prominent Australian public figure

when she contacted Pitt/AFIRM/the US Army.  She threatened to publicly accuse Mr. Gerlach of

stealing her (failed) CellSpray technology, knowing perfectly well that: (a) Australian journalists

would cover the story extensively; and (b) Mr. Gerlach had absolutely no track record of having studied burns or skin prior to his achieving, in 2006, per exhibit 9, a major breakthrough in reducing both scars and healing times using SOS.

Ms. Wood had Mr. Gerlach-and-company over a barrel—and this was despite the fact that her allegations were, in and of themselves, an absolute lie.  Plaintiff believes persons at Pitt and in the Army held meetings and decided they needed to bring Ms. Wood onboard as a fellow fraudster.  Hence, in late-2008/early-2009, Ms. Wood was apprised of plaintiff's ideas regarding pompholyx and burn healing; she was told exactly how Mr. Gerlach was creating sprayable (embryonic) skin and reducing burn scars.

**Exhibits 27a through 27d.**  Ms. Wood was named West Australian of the Year for 2003; Australian of the Year for 2005; and voted Australia's Most Trusted Person for six consecutive years in polling done by a popular magazine.

**Exhibit 28.**  In April of 2007, Ms. Wood wanted to sell her CellSpray technology.  (Avita Medical's previous corporate name was Clinical Cell Culture.)

**Exhibit 29.**  On August 4, 2008 Ms. Wood did an interview for the Australian Academy of Science.  That is the date the Australian Academy of Science provides in its description of the video that is exhibit 29.  It is also the date seen in the video's first 30 seconds.  (Although the video's title at YouTube indicates it was one of two interviews, plaintiff has been unable to locate a second interview.)

From the 4:39 minute mark in exhibit 29 to the 11:35 mark, Ms. Wood talks about burn scars.  She never mentions or alludes to ReCell, or a portable burn kit (which is what ReCell is), or half-hour skin cell culturing, or any past breakthrough in reducing scars.  Plaintiff submits that she could not talk about such things because, when the interview happened, she had not yet achieved or invented such things; had not yet linked up with the US Army, or AFIRM, or the USAISR.  She also – probably – had not yet learned of defendant Gerlach's success utilizing plaintiff's ideas.

**Exhibits 30a through 30c.**  Plaintiff believes late-2009 is the approximate date of ReCell kits earliest existence.

**Exhibit 31.**  In 2014, Ms. Wood filed to trademark the name ReCell.  On page two of her filing she stated that she began using the ReCell product name in January of 2003.  Said statement directly contradicts information in exhibit 28, which is from 2007.

**Exhibit 32.**  On June 28, 2010 a fraudulently-dated video was published on YouTube.  The video purports to show a ReCell kit being used by doctors in 2003; the year 2003 is shown at the video's end.  Plaintiff believes US Army employees may have had a hand in making the video.  Plaintiff believes the video was meant to deceive persons at the US Patent and Trademark Office if they asked Ms. Wood to prove her false claim, seen in exhibit 31, that she was using ReCell kits in 2003.

Plaintiff further believes US Army employees may have created a dummy medical supplies corporation—the Mareen Group—to enhance the video's seeming legitimacy.  Prior to the summer of 2018, Avita Medical's website had a link to the video.

**Exhibit 33.**  Ms. Wood's application for a US patent was filed in February of 2011.  If one chooses to believe her claim that she began using ReCell kits in 2003, one must also believe she waited roughly eight years to file for a patent in what is, arguably, the world's most important market for high-tech medical devices.  Plaintiff submits that the actual time between Ms. Wood's first use of ReCell kits and her filing for a US Patent was approximately one-year-and-three-months, per exhibits 30a, 30b, 30c, and 33.

**Exhibits 34a through 34e.**  Exhibit 34a was published on YouTube on February 1, 2011, and it makes very clear that SOS is an historic improvement in burn care.  The man seen in exhibit 34a's first few seconds is defendant Steven E. Wolf.  Per exhibit 34b, Mr. Wolf was director of the Army's burn center, in San Antonio, from 2004-2008; and chief of clinical trials from 2008-2011, before taking a job at the University of Texas – Southwestern Medical Center in Dallas.

Exhibit 34c is a video produced by an Australian company named In Shot Productions. Exhibits 34d and 34e are screen grabs from exhibit 34c showing defendant Steven E. Wolf.

Plaintiff believes exhibits 34a through 34e establish that defendant Steven E. Wolf has overseen the Army's clinical trials of both defendant Gerlach's- and defendant Wood's versions of SOS, both of which rely upon plaintiff's original and valuable ideas regarding pompholyx and scarless burn healing.

PLEADING PAGE **36** OF **48**

**Exhibit 35a.**  Certain aspects of the FDA's summary of ReCell's safety and effectiveness suggest the Army may have co-opted and corrupted FDA employees, enlisting them in efforts to coverup defendants' theft and use of plaintiff's IP.  At the very least, the FDA was given false information.  At the top of page four of exhibit 35a, one sees that the FDA was told that ReCell "was commercialized in the European Union (EU) in 2005" and that it "also has been commercially marketed in Australia since 2006."

As regards the possibility of FDA employees assisting in a coverup: In the second paragraph of page 18 of exhibit 35a, the following statement is made:

> "On average, autografting [i.e., ReCell use] was performed 7 days following the burn injury, demonstrating that these partial-thickness burns failed to heal with conservative measures, and therefore confirming that autografting was indicated."

Plaintiff submits that the FDA's apparent trial protocol requiring a seven day wait before allowing ReCell use is suspicious.  It is suspicious because ReCell works best if used as soon as possible and—outside of FDA clinical trials—it *is* used very soon after patients arrive at hospitals, often within a couple of hours.  (Incredibly, a harvested patch of a patient's healthy skin can be cultured into a spray-able liquid in half an hour.  This pleading will eventually detail exactly how that rapid culturing is achieved.)

Plaintiff submits that the real reason for the FDA's apparent requirement of a seven day wait stems from the years of lies told by Ms. Wood, from 2003 to 2008.  Prior to linking up with US Army doctors in late 2008/early 2009, Ms. Wood had struggled to reduce the time needed to culture patients' shaved healthy skin.  A remote lab was used and the process took around three

weeks.  In addition, all three of the skin's layers were cultured; the (lower) dermis, the (middle) basal layer, and the (top) epidermis.  (Avita's ReCell kits and RenovaCare's CellMist system both culture, and spray, only the middle basal layer cells.)  Plaintiff believes that, from 2003-2008, Ms. Wood made various false claims to journalists and others regarding the skin culturing time she had achieved.

**Exhibit 35b.**  A news story from 2005, it mentions a culturing time of five days.

**Exhibit 35c.**  A news story from 2005, it quotes various doctors questioning CellSpray's effectiveness and says, "CellSpray aims to reduce from 21 to five days the time it takes to culture skin."  It also says a remote laboratory was used.

**Exhibit 35d.**  A news story from 2005, it refers to a two-to-three-week culturing in a remote lab.

**Returning to exhibit 35a,** plaintiff submits that the seven-day wait before using ReCell was suggested to the FDA because it was—more or less—in accord with the culturing time Ms. Wood had been falsely claiming she had achieved in the years prior to her linking up with the US Army.  Additionally, a seven-day wait would lessen ReCell's effectiveness at reducing scars which, in turn, would make it less suspicious, less conspicuous.  It would make ReCell more like the vast majority of new medical technologies which are merely incremental improvements over prior technologies.

**Exhibits 35e and 35f (along with exhibits 30a through 30c).**  Clinical trials of ReCell began in late-2009/early-2010.  The FDA did not approve non-investigational use until September 21, 2018—and that was only for patients 18-and-older.  Approval for ReCell's use on younger patients was given on June 10, 2021.  Plaintiff submits that the FDA did not need some eight years of trials to approve ReCell/SOS for use on patients over 18; nor was another two-and-

a-half years of trials needed to approve it for younger patients.  Pompholyx eczema has no

known long term adverse health effects and anyway—incredibly—believe it or not—ReCell and

defendant Gerlach's/defendant RenovaCare's CellMist both use nothing but a sterile saline

solution to culture (basal layer) skin cells.  The use of a saline solution is seen on page 15 of

exhibit 33; specifically, the items numbered 20, 21, and 22.  Plaintiff submits that FDA clinical

trials of ReCell were intentionally drawn out to make ReCell seem more like the typical new

medical technology; a technology that used esoteric, new-fangled steroids or drugs or synthetic

bio-chemicals that would need to be carefully scrutinized for long-term adverse side effects.

Super-quick FDA approval could have prompted too many questions from doctors or the news

media.  Why wasn't ReCell's claimed predecessor, CellSpray, already in wide-spread use?  If

ReCell is such a huge improvement over CellSpray, what tweaks were made to the original

product?

### How ReCell Kits Work

### &

### The Difference Between ReCell and CellMist

**Exhibit 36.**  Plaintiff's plain-language explanation of what a ReCell kit does and how one

uses it.  Plaintiff does not necessarily intend to use exhibit 36 either during trial or pre-trial.  He

includes it in his pleading only as a contingency measure in the event defendants' attorneys start

tossing around mountains of esoteric med-speak for the purpose of confusing the court and/or

jurors.

**Exhibit 37.**  A list of specific scientific ideas or revelations that various defendants did not realize or understand prior to their gaining access to plaintiff's original observations, theories, and ideas regarding pompholyx and burn healing.

CellSpray involved culturing all three layers of skin (lower dermal layer, middle basal layer, and top epidermal layer) in a remote lab.  The process took three weeks and they had to shave off a large area of patients' unburned skin.  That lengthy culturing time is, plaintiff believes, a major reason why CellSpray did not result in reduced scarring.  The sooner one sprays on the new liquid/embryonic skin, the better the results.

With ReCell only a postage-stamp sized area of shaved skin needed.  Culturing is done in the kit and takes half an hour or less.  The resulting watery liquid heals an area 80 times the size of the harvested shaving.

ReCell skin culturing involves merely soaking a patient's shaved skin in a sterile saline solution.  This mimics what happens with pompholyx where sweat accumulates within the skin due to missing or non-functioning sweat pores.  Only the skin's middle, basal layer cells are cultured and sprayed.  The basal cells magically create a smooth epidermal (top) layer of skin.  They do not, however, create a lower (dermal) layer; hence, ReCell does not work well on full-thickness burns in which the skin's sweat glands are damaged. (Sweat glands are located deep in the skin, in the dermis.)

Dr. Gerlach/(RenovaCare) calls his version of SOS CellMist.  Like Dr. Wood, he harvests only patients' (healthy) basal layer skin and soaks it in a sterile saline solution for about half an hour prior to spraying on a wound.  Drs. Gerlach and Wood, however, use different methods for obtaining only basal skin.  Dr. Wood manually pulls apart the shaved dermal and epidermal layers using a pair of tweezers.  A brush or scalpel is then used to brush or scrape the basal cells

off the patch of epidermis and/or dermis.  Dr. Gerlach uses a centrifuge to separate out the basal cells.

Dr. Gerlach has patented a fancy spray gun.  Dr. Wood has patented—apparently in multiple nations—the culturing technology (i.e., soaking basal cells in a saline solution) and uses a simple hand-pump sprayer.  Plaintiff believes Dr. Wood's relatively low-tech methods—the hand sprayer and the manual obtainment of the basal cells—net the exact same scar-reduction as Dr. Gerlach's more gadget-centric methods.

**Exhibit 38a (combined with exhibit 28).**  Sometime after April of 2007, when she had plans to sell her CellSpray technology, Dr. Wood changed her mind and decided instead to donate the patent to a charitable foundation she was involved with named the McComb Foundation.  (Plaintiff wishes to hereby state again his belief that CellSpray was a completely failed technology; the patent covering it was completely worthless.)  In November of 2011, Dr. Wood realized she needed to get the patent back again.  Possessing it again would be helpful as she would, forevermore, be promulgating the false narrative that ReCell was merely an improved version of CellSpray.

**Exhibits 38b and 38c (combined with exhibits 34a through 34e).**  In May of 2017, Avita asked the US patent office to do an Inter Partes Review of RenovaCare's spray gun patent, claiming that the patent should never have been issued.  Plaintiff believes the Inter Partes Review request was actually intended to create a misleading false facade; it was a way of putting the final touch on a years-long coverup of the theft of plaintiff's IP.  To outside observers it would look like there was a genuine competition or dispute between two medical technology companies; an outsider would assume there was no collaboration of any kind between Avita and

RenovaCare.  Behind the curtains, however, per exhibits 34a through 34e, and numerous other exhibits, there was plenty of collaboration—on a very elaborate coverup of the theft of plaintiff's IP, which both Avita and RenovaCare had utilized to create SOS.

**Exhibits 39a through 39f.**  Exhibits supporting this pleading's relief section.  As a pro se pleading writer, plaintiff does not know where such exhibits should be introduced.  He is arbitrarily placing them here and hopes the court will understand.

## IV.  Relief

Plaintiff seeks 2,228,800,000 US dollars as relief for lost income.  Though the amount may seem a bit high to defendants, plaintiff does welcome all settlement offers.

To get the figure of $2,228,800,000 plaintiff began by using Avita's planned price of $5,000 per ReCell kit.  The $5,000 price is seen near the bottom of page 12 of **exhibit 39a**. Plaintiff believes the $5,000 price will allow for a gross profit of approximately $4,600 per kit.

Plaintiff, however, doubts Avita's ability to maintain that $5,000 price through the years. Plaintiff believes doctors in third world nations will eventually build homemade ReCell kits and this will put downward pressure on the price of authentic ReCell kits.  Downward pricing pressure will continue until ReCell kits sell for around $1,000 *in the US*, allowing for a gross profit of $400-600 per kit sold in the US.

**Exhibits 39b and 39c** provide information on the salaries of US plastic/burn surgeons. The information indicates that US burn surgeons earn roughly $200 per hour, on average.  If it took a US surgeon two hours to build a homemade ReCell kit, the time spent on the project would cost the surgeon about $400 in lost wages.  Hence, plaintiff believes Avita will be able to maintain a price on ReCell kits that will allow, in the US, approximately $400 in profit.


**On page eight of exhibit 39d** Avita provides its projections of 'Annual Incidence of Patients,' which assumes one ReCell kit sold per patient, according to information seen in the upper-right corner of the page.

Plaintiff will now do calculations <u>using Avita's sales projections for *only the US*</u>.  Looking at the table of ReCell sales projections seen on page eight of exhibit 39d, one sees a column for "Percent Applicable."  This apparently refers to the percentage of patients, who have a particular medical condition, who would benefit from treatment using ReCell.

The "Percent Applicable" varies from a low of 20 percent for the treatment of DFU, or diabetic foot ulcers, to a high of 90 percent for burns and aesthetic procedures.

Plaintiff will keep things simple and generously assume an across-the-board "percent applicable" of 10 percent.  In other words, plaintiff will drastically reduce Avita's projections of future unit sales of ReCell.

Adding up the figures in the column for unit sales in the US results in the figure 14,256,000.  Avita has rounded that off to 14.3 million, and plaintiff will proceed using Avita's rounded-off figure, ***reduced by 90 percent***.

Multiplying 1,430,000 [ReCell kits] x $400 [profit per kit] = $572,000,000 in profit, annually, from sales of ReCell kits, *in the US only*.

PLEADING PAGE **43** OF **48**

Now reduce $572,000,000 by 80 percent to represent plaintiff being allowed a mere 20 percent of profits from US-only sales of ReCell, and we arrive at plaintiff receiving annual royalties of $114,400,000.

Now multiply that $114,400,000 figure by 20 to represent plaintiff's receiving royalties for 20 years, and one gets the figure of $2,288,000,000.  As of early 2022, plaintiff is 64 years old. The argument for 20 years of royalties is, of course, based upon the assumption that plaintiff will live another 20 years.

**Exhibit 39e** is RenovaCare's "2018 Outlook and Shareholder Update."  On its third page it asserts there is "a $45 billion market in the U.S. alone" for RenovaCare's SkinGun and CellMist products.

Suffice to say, defendants Avita Medical and RenovaCare may wish to repudiate their US sales projections.  And the repudiations may be warranted and credible.  And therefore, plaintiff hereby wishes to suggest that, without there being agreement on the dollar amount of relief due plaintiff, the court might consider, as a partial relief, awarding plaintiff the US patents of defendants Fiona Wood/Avita Medical, and Jorg Gerlach/RenovaCare.  Plaintiff suggests said relief, as a partial relief, because it is reasonable to assume that US sales of SOS products will comprise 20-35 percent of worldwide sales; and because, if defendants had dealt with plaintiff honestly from the beginning, plaintiff would likely have agreed to royalties of 20-35 percent of worldwide profits; and because, as regards patent-surrender-as-partial-relief, various defendants, including Pitt, have no SOS patents that might be surrendered.

## V. Injunctive Relief

Plaintiff asks that the court consider the following enjoinments.

1. Enjoin defendants Fiona Wood/Avita Medical and Jorg Gerlach/RenovaCare to surrender their US patents.

2. Enjoin the US Patent and Trademark Office to revoke the patents of defendants Fiona Wood/Avita Medical and Jorg Gerlach/RenovaCare on the grounds that said patents are based upon ideas that were/are in the public domain.  Additionally, per the USPTO's rules, patents can be revoked if applicants submit false or deceptive information.

3. Enjoin Pitt, Avita Medical, and RenovaCare to end all ties to burn survivors charitable groups.  Said enjoinment would include speaking engagements and appearances of Pitt-, Avita Medical-, and RenovaCare employees at conferences sponsored-, organized-, or paid for by burn survivors charitable groups.

4. Enjoin Pitt to sever all ties with the DHS and DoD and all agencies/departments/branches within the DHS and DoD, such as DARPA, AFIRM, AFIRM II, the USAISR, and the US Army Medical Research and Materiel Command (USAMRMC).

    This, because defendant Pitt is a threat to the integrity and independence of the

NIH, the NSF, and the US Patent and Trademark Office.  And because the DHS, DoD and US Army are a threat to the integrity and independence of Pitt.

And also because Pitt, with its extensive ties to the DoD and other federal agencies, is a threat to the rule of law—or at least administrative laws—as such laws may apply to grant-dispensing agencies such as the NIH and the NSF.

5. Enjoin Pitt from hiring employees from the federal government for a period of ten years.

6. Enjoin the DHS, DARPA, the NSA, and the DoD and its various branches/departments/divisions/sub-entities from hiring employees from Pitt for ten years.

7. Enjoin that, for ten years, Pitt get a percentage of its total funding from federal sources that is no greater than what, percentage-wise, the typical large American research university gets.

This, because the funding Pitt receives from Pennsylvania taxpayers is woefully inadequate and, consequently, Pitt has become corrupt in its efforts to pull in federal dollars.  An example of the corruption would, of course, be the collusion between Pitt- and Army employees in their theft of plaintiff's IP as well as their collusive efforts to cover-up the theft.

PLEADING PAGE 46 OF 48

8.  Enjoin certain individual defendants' resignation from the editorial board of the medical journal Burns.  Said defendants have been deceiving the scientific community about the true extent of their past achievements and have shown a willingness to either steal IP or to assist friends and associates in covering-up IP theft.

9.  Enjoin certain defendants to state in all materials such as brochures, advertising, press releases, and correspondence with scientists, the news media, burn survivors organizations, and investors, that spray-on skin is based upon a discovery made about pompholyx eczema.

10. Enjoin the US government, and the states of Texas and Pennsylvania, and defendant AgTac to immediately and permanently cease surveilling plaintiff.

11. Enjoin defendant Pitt to provide to the various state legislatures information about its budgeting, staffing, capital expenditures, academic programs and departments, and research collaborations with federal entities and agencies.  This, because Pitt appears to get the bulk of its funding from federal taxpayers rather than Pennsylvania taxpayers and is, consequently, a national university.

12. Should the court rule that plaintiff's ideas on burn healing were public property plaintiff asks that the court then, consequently, enjoin all defendants from suing plaintiff in the future, in the event that he discloses to scientists and others, including journalists, the truth about SOS's origins.  Plaintiff believes such an enjoinment is

needed on humanitarian grounds because (a) various defendants have a never-ending need to withhold information from outsiders/outside researchers and (b), per exhibits 30a and 39f, SOS does not work well on full-thickness burns in which sweat glands are damaged.

In other words: Plaintiff would like enjoinment against future lawsuits resulting from plaintiff disclosing to outsiders what he knows about SOS, and also, enjoinment against future lawsuits that may allege plaintiff defamed defendants by disclosing what he knows of defendants' past dishonesty as it relates to SOS. The enjoinment would bar defendants from suing plaintiff for both defamation and for the disclosure of technical information relating to the workings of SOS.

In addition to the issue of defendants withholding information from outsider-researchers, there is also the issue of defendants withholding information from pompholyx patients and dermatologists. Pompholyx sufferers often spend time and money trying to discern what allergens in their environment cause their pompholyx, which doctors typically view as an autoimmune response. Meanwhile, defendants have proven – very decisively – that pompholyx is caused by missing or malfunctioning sweat pores.

Kevin Rogers
April 17, 2023

538 N 24TH apT. 1
Lincoln, NE 68503

PLEADING PAGE 48 OF 48